# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**MARK SENTI, GERALD STELZER,**
**and**
**PAUL LEPPEK,**

**Plaintiffs,**

-vs-                                        Case No.  6:06-cv-1903-Orl-22DAB

**SANGER WORKS FACTORY, INC.,**

**Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration without oral argument on the following motion filed

herein:

| | |
|---|---|
| **MOTION:** | **MOTION TO STAY LITIGATION AND COMPEL ARBITRATION OR, IN THE ALTERNATIVE, TO DISMISS THE COMPLAINT (Doc. No. 4)** |
| **FILED:** | **December 22, 2006** |

**THEREON** it is **RECOMMENDED** that the motion be **GRANTED**.

Plaintiffs Mark Senti, Gerald Stelzer and Paul Leppek (the "Shareholders") filed suit against

Defendant Sanger Works Factory, Inc. ("Sanger Works") for claims arising out of execution of an

Asset Purchase Agreement dated March 19, 2004 between Sanger Works, the Shareholders and their

company, GSMA Systems.  Doc. No. 13-2.  Sanger Works now seeks to stay the litigation and compel

arbitration of the claims set forth in the Complaint filed by the Shareholders, arguing that the claims

of the Shareholders – interpretation of provisions of the parties' Asset Purchase Agreement or the periodic Earn-Out payments under the Asset Purchase Agreement – are due to be arbitrated under the dispute resolution or arbitration provisions agreed to in the Asset Purchase Agreement.  In the alternative, Sanger Works seeks to have the Shareholders' Complaint dismissed for failure to state a claim upon which relief can be granted.  The Court finds that arbitration of the Shareholders' claims should be compelled.

**Standards of Review**

A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that a plaintiff can prove no set of facts that would entitle him to relief.  *Conley v. Gibson*, 355 U.S. 41 45-46 (1957); *Harper v. Blockbuster Entertainment Corp.,* 139 F.3d 1385, 1387 (11th Cir. 1998).  A trial court, in ruling on a motion to dismiss, is required to view the complaint in the light most favorable to the Plaintiff.  *Scheuer v. Rhodes*, 416 U.S. 232 (1947); *Beck v. Deloitte & Touche*, 144 F.3d 732, 735 (11th Cir. 1998).  In seeking dismissal for failure to state a viable claim, a defendant thus bears the "very high burden" of showing that the plaintiff cannot conceivably prove any set of facts that would entitle him to relief.  *Id.*  The Court is also limited to examining the four corners of the complaint. *Rickman v. Precisionaire, Inc.,* 902 F.Supp. 232, 233 (M.D. Fla. 1995).

There are three factors courts consider in ruling on a motion to compel arbitration of a given dispute: (1) whether a valid written agreement to arbitrate exists; (2) whether an arbitrable issue exists; and (3) whether the right to arbitrate was waived.  *Florida Farm Bureau Ins. Companies v. Pulte Home Corp.* 2005 WL 1345779, *3 (M.D. Fla. 2005) (citing *Sims v. Clarendon Nat'l Ins. Co.*, 336 F.Supp.2d 1311, 1326 (S.D. Fla.2004)); *Raymond James Fin. Servs. v. Saldukas*, 896 So.2d 707, 711 (Fla. 2005); *Seifert v. U.S. Home Corp.*, 750 So.2d 633, 636 (Fla. 1999).

**Background Facts**

Sanger Works, as buyer, entered into an Asset Purchase Agreement (the "Agreement") with GSMA Systems, Inc. (the "Company"), as seller, and the Shareholders, on March 19, 2004.  Doc. No. 13-2.  Sanger Works acquired substantially all of the assets of the Company, which designed and sold robotics systems for packaging automation operations; as a part of the purchase price, the Company was to receive periodic "Earn-Out" payments to be paid quarterly over the course of seven years, commencing on March 19, 2004.  The pertinent portion of the Agreement governing dispute resolution reads:

### 9. DISPUTE RESOLUTION

**9.1 ARBITRATION.**  Except for disputes arising under Section 3.3 or Section 3.4 (which shall be resolved as described therein), if there is any dispute or disagreement between or among any of the parties as to the interpretation of any provision of, or the performance of obligations under, this Agreement (a "Dispute"), then the Dispute shall be finally settled by binding arbitration held in Orlando, Florida in accordance with the Commercial Arbitration Rules of the American Arbitration Association in effect as of the Closing Date, except to the extent otherwise expressly set forth in this Article 9. Either Buyer or Appointed Agent may submit a Dispute to arbitration by filing a request for arbitration with the American Arbitration Association and delivering a copy of such request for arbitration to the other. . . . This Article 9 shall be construed and enforced in accordance with the Federal Arbitration Act, notwithstanding any other choice of law provision contained in this Agreement.

Doc. No. 13-2 §§ 9.1 & 9.3 (the "Arbitration Clause").  Expressly excepted from the application of the Arbitration Clause are certain disputes arising under Section 3.3 of the Agreement, which deals with the Earn-Out payments.  Section 3.3 provides in relevant part:

**3.3 Earn-Out.** Within thirty (30) calendar days after the end of each calendar quarter occurring during the period beginning on the date of this Agreement and ending on the seven (7) year anniversary of the date of this Agreement, Buyer shall make written reports to Company. Each such report shall specify the amount of the Net Sales for the preceding calendar quarter. Simultaneously with the making of each such report, Buyer shall pay to Company an amount equal to the Net Sales covered by such report,

multiplied by the Earn-Out Rate; provided, that no Earn-Out shall be paid on the initial $1,578,070.00 of Net Sales following Closing. Notwithstanding anything to the contrary in this Agreement, in no event shall the aggregate amount paid by Buyer under this Section 3.3 exceed the Net Adjusted Amount plus Four Million Eight Hundred Thousand Dollars ($4,800,000.00). . . . In the event of a dispute or disagreement relating to the Earn-Out that Buyer and Appointed Agent are unable to resolve, either Buyer or Appointed Agent may elect to have all such disputes or disagreements resolved by an independent accounting firm of nationally recognized standing to be mutually selected by Buyer and Appointed Agent[1]. The accounting firm shall be instructed to use every reasonable effort to perform its services within fifteen (15) calendar days of submission of the dispute to it and, in any case, as soon as practicable after such submission. The fees and expenses for the services of the accounting firm shall be shared equally by Buyer on the one hand and Company and Shareholders on the other hand.

Doc. No. 13-2 § 3.3. The "Earn-Out" payments are based on "Net Sales" defined as follows:

"Net Sales" means the aggregate Net Selling Price of all Robotic Equipment/Services recognized as revenue by Buyer for profit at *a Contract Gross Margin of thirty percent (30%) or more* and such other revenue of the Buyer as shall be agreed from time to time in writing by Appointed Agent and the President of Buyer (such writing to apply only to the specific sale to which it relates), minus returns[.] The thirty percent (30%) Contract Gross Margin limitation shall not apply to jobs in backlog at the Closing Date.

See Doc. 13-2, Ex. C (emphasis added).

As alleged in their Complaint, the Shareholders seek to recover "Earn-Out" payments based on the Net Selling Price of **all** sales of Robotic Equipment/Services recognized as revenue for profit after December 31, 2005[2]. Sanger Works contends that, under the terms of the Agreement, only the Net Selling Price for those sales of Robotic Equipment/Services recognized as revenue by Sanger

[1]Pursuant to the terms of the Agreement, the "Appointed Agent" is Plaintiff Senti. Doc. No. 13-2 § 10.1.

[2]The parties reached an agreement concerning the Earn-Out payments for all periods ending on or before December 31, 2005; therefore the Earn-Out payments in dispute are for the period after December 31, 2005 to present. Doc. No. 2 ¶ 25; Doc. No. 5 n.1.

-4-

Works for profit at a Contract Gross Margin of **thirty percent (30%) or more** are to be considered when determining the amounts of the periodic Earn-Out payments.

The Shareholders contend that, despite representations to the contrary at the time the Agreement was made that robotics sales would uniformly result in gross profit margins well above 30 percent, after the asset sale to Sanger Works, it began discounting price quotes for robotics systems at or below 30 percent projected profit margins so that no robotics sales have resulted in a "Contract Gross Margin" as defined under the Agreement. Doc. No. 2 ¶ 12, 18. According to the Shareholders, when it was brought to the attention of the management of Sanger Works that quoting robotics sales at or below 30 percent "Contract Gross Margins" deprived Shareholders of the Earn-Out payments, then-manager Marcus Shiveley "agreed that this discounting was already accounted for in the parties' Agreement and offered to put any necessary documentation in place to make sure that Plaintiffs received their Earn-Out payments for prior robotics sales." Doc. No. 2 ¶ 20. Mr. Shiveley resigned from Sanger Works by June 2005. Doc. No. 2 ¶ 22. The new President Fred Higgenbottom, according to the Shareholders, at first stated that nothing would change with respect to their Earn-Out payments, but subsequently stated that Sanger Works was not required to make Earn-Out payments unless and until robotics sales resulted in Contract Gross Margins at or above 30 percent. Doc. No. 2 ¶¶ 23 & 24.

At the time the Shareholders filed suit against Sanger Works in state court in Brevard County on November 16, 2006, the Shareholders alleged that Sanger Works intended to sell its assets, including those acquired from GSMA, to a third party and did not express any intent to compensate the Shareholders through Earn-Out payments for the sale to the third-party. Doc. No. 2 ¶ 26.

Sanger Works removed the case to this Court on December 15, 2006.  Doc. No. 1.  On December 22, 2006, it filed a Motion to Stay Litigation and Compel Arbitration Or, in the Alternative, to Dismiss the Complaint (Doc. No. 4), which was referred to this Court on January 8, 2007.  Doc. No. 14.

## *ANALYSIS*

**Federal Arbitration Act Standards**

Under the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.,* courts have developed a common law of arbitrability that implements a strong national policy favoring the resolution of commercial disputes through arbitration *Allied-Bruce Terminix Companies v. Dobson,* 513 U.S. 265, 270-71 (1995). Section 2 of the Act provides, in relevant part:

> A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  According to Supreme Court precedent, section 2 is a Congressional declaration of a liberal federal policy favoring arbitration agreements and doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability. *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25 (1983).

Under sections 3 and 4 of the Federal Arbitration Act, litigants are provided with three options when litigating a contract containing a mandatory arbitration clause: they may move to stay the court proceedings, compel arbitration, or waive arbitration. 9 U.S.C. §§ 3, 4.  Section 3 requires that the

court, upon application by a party, stay judicial proceedings if the issues are properly referable to arbitration. 9 U.S.C. § 3.  It provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing [sic] the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.  The question of whether a contract creates a duty for the parties to arbitrate the particular grievance is an issue for judicial determination.  *AT&T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 649 (1986).  Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court rather than the arbitrator. *Id.*

Generally, when deciding whether the parties agreed under the FAA to arbitrate a certain matter, courts "should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944 (1995). Therefore, the court looks to Florida law to determine if there was an enforceable arbitration agreement.  *See A.I. Trade Finance, Inc. v. Petra Int'l Banking Corp.,* 62 F.3d 1454, 1463 (D.C. Cir. 1995) ( "[A] federal court applies state law when it decides an issue not addressed by federal law, regardless of the source from which the cause of action is deemed to have arisen for the purpose of establishing federal jurisdiction."). Under Florida law, in reviewing a motion to compel arbitration, a trial court must consider three elements: (1) whether a valid, written agreement to arbitrate exists, (2) whether an arbitrable issue exists, and (3) whether the right to arbitrate has been waived. *Seifert v. U.S. Home Corp.,* 750 So.2d 633 (Fla.1999). "All questions concerning scope or waiver of the right to arbitrate under contracts

should be resolved in favor of arbitration rather than against it." *Zager Plumbing, Inc. v. JPI Nat. Const., Inc.,* 785 So.2d 660, 662 (Fla. 3d DCA 2001) (citing *Beverly Hills Dev. Corp. v. George Wimpey of Fla., Inc.,* 661 So.2d 969, 971 (Fla. 5th DCA 1995)).

**Application**

Sanger Works contends that, to the extent that the Shareholders' claims relate either to the interpretation of the Agreement or to the performance of the parties' obligations under the Agreement, Article 9's dispute resolution and arbitration provisions govern. Alternatively, Sanger Works argues, the provisions of Section 3.3 of the Agreement, governing disputes relating to calculation of the "Earn-Out" payments, requires the dispute be resolved by a mutually-agreeable independent accounting firm of nationally recognized standing.

The Shareholders respond that arbitration should not be compelled because the Arbitration Clause specifically excludes the Earn-Out section, or Section 3.3, from arbitration. They further argue that the accountant dispute-resolution clause is also inapplicable because they are not challenging the method of calculating the amount of Earn-Out payments. Rather, they argue that the dispute "involves the fundamental issue of whether and how [the Shareholders] are entitled to receive payment for [Sanger Works'] acquisition of GSMA Systems, Inc." because they have alleged that Sanger Works is in breach of the Agreement both by selling below the 30% Contract Gross Margin minimum and by selling Sanger Works' assets (part of which were originally GSMA's) without provision for adequately compensating the Shareholders because the Earn-Out payments have not been made.

Under the Arbitration Clause, all disputes or disagreements "between or among any of the parties as to the interpretation of any provision of, or the performance of obligations under, this

Agreement" shall be settled by binding arbitration, with the exception of certain disputes under

Section 3.3[3] which "shall be resolved as described therein."  Doc. No. 13-2 §§ 9.1 & 9.3. In the

context of the Arbitration Clause, "interpretation" or "performance of obligations" clearly would

include claims for lack of performance or breach of contract.  *See Waterhouse Const. Group, Inc. v.

5891 SW 64th Street, LLC,* __ So.2d __, 2007 WL 403721, *4 (Fla. 3rd DCA Feb. 7, 2007) (terms of

the arbitration provision in agreement indicated that the parties intended that the arbitration provisions

encompass all of the disputes related to the performance of the agreements including breach of

contract claims).

     The Shareholders contend that the accountant dispute resolution mechanism does not apply

to their claims and Sanger Works only half-heartedly argues it does, without any specific analysis of

what sort of statistics-related disputes accountants would be able to resolve.  The Shareholders also

allege that the Agreement is ambiguous because it does not address the parties' respective rights and

obligations concerning Contract Gross Margins for robotic sales; that the parties modified the

Agreement for the Shareholders to receive Earn-Out payments for all robotics sales, without regard

to whether the Contract Gross Margins were at or above 30 percent; and/or that Sanger Works

breached the Agreement by failing to make Earn-Out payments.  Doc. No. 2 ¶¶ 29, 31, 32.  These are

not issues that accountants are qualified to resolve because they involve more than the calculation of

the correct amounts due (applying generally accepted accounting principles) under the Earn-Out

section; thus, the accountant dispute resolution mechanism of Section 3.3 does not apply.

---

[3]There is also an exception for disputes over calculations of Net Working Capital which shall be resolved by an independent accounting firm; this provision is not relevant to the Shareholders' claims.

In *Fit Tech, Inc. v. Bally Total Fitness Holding Corp.*, the First Circuit considered an asset purchase agreement containing an alternate dispute resolution mechanism[4] which submitted to PriceWaterhouseCoopers for binding resolution all financial disagreements about calculation of the "advance earn-out" schedules, which were based on a precise formula based on earnings before interest, depreciation, amortization, and taxes.  374 F.3d 1, 3 (1st Cir. 2004).  The court affirmed the trial court's refusal to compel referral to accountants for resolution the separate claims for actions the court characterized as "operational misconduct," such as diverting new customers to its existing centers to reduce extra earnings, which could theoretically alter the figures in the schedules and reduce the pay-outs, but were of a different nature; referring the operational misconduct issues to the accountants, the court held, "would make no sense." *Id*. at 8.  As the court explained:

> In context, it therefore makes the most sense to read "any disagreements" as referring to disagreements about *accounting* issues arising in the calculations that underpin the [earn-out] schedules. Conversely, it makes no sense to assume that accountants would be entrusted with evaluating disputes about the operation of the business in question. Yes, operational misconduct may well affect the level of earnings and therefore the schedules, but the misconduct itself would not be a breach of proper accounting standards. Nor would one expect accountants to have special competence in deciding whether business misconduct unrelated to accounting conventions was a breach of contract or any implied duty of fair dealing.

*Id*. at 8.  Similarly, the Shareholders do not challenge the computation of the Earn-Out payments in accordance with accepted accounting principles; rather, they contend that Sanger Works has failed to compensate them at all or fairly, based in part on decisions to sell the robotics at below minimum Contract Gross Margins or to sell the entire company to a third party.  This is not an accounting issue but one that falls under "performance" of duties under the Agreement or "interpretation" of the terms of the Agreement.  *See Blutt v. Integrated Health Servs., Inc.,* No. 96 CIV. 3612 LLS., 1996 WL

---

[4]The agreement did not contain a separate arbitration clause. *Fit Tech*, 374 F.3d at 3.

-10-

389292 (S.D. N.Y. July 11, 1996) (holding that, where earn-out payments were allegedly smaller than they should have been and plaintiffs claimed breach of the duty of good faith and fair dealing for buyer's intentional refusal to create a separate entity to amortize expenses over time and increase income figure driving the earn-out payment, only statistical-type disputes were subject to arbitration by the accountants, not issues of the reasonableness of decision about whether separate entity should have been created).

The Shareholders contend that the dispute over the Earn-Out payments are "specifically excluded from the scope of the parties' Arbitration Clause in § 9 because it is a dispute "arising under Section 3.3." The Shareholders ignore the parenthetical in the Arbitration Clause which says such § 3.3 disputes "shall be resolved as described therein." In this case, where the dispute resolution process utilizing an accountant is insufficient to resolve the dispute over complete non-payment of the Earn-Out or sale of the business, then § 3.3's accountant dispute-resolution mechanism does not apply. The Shareholders cite to *Johnson v. Nationwide Mutual Insurance Company*, 828 So.2d 1021, 1025 (Fla. 2002) for the proposition that an appraisal/valuation dispute resolution clause is not applicable where the issue is whether a claim under an insurance policy is even covered at all and the dispute is decided in the courts. Doc. No. 13 at 6. The *Johnson* opinion is inapposite because the insurance policy at issue did not contain a stand-alone arbitration clause (merely an appraisal process) as the Agreement in this case does. Moreover, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25 (1983).

Stated simply, the two dispute resolution provisions are complementary and comprehensive. The only disputes not covered by the arbitration requirement are those within the accountants'

purview.  By arguing that their claims a fall outside the ambit of § 3.3, Plaintiffs have left themselves within § 9.1.

In addition to the Shareholders' allegations of breach, ambiguity, or modification of the Agreement, they assert claims for breach of the obligation of good faith and fair dealing; rescission; unjust enrichment; and fraudulent inducement and negligent misrepresentation.  Doc. No. 2.  Disputes over whether a contract term is ambiguous, has been modified or breached go directly to the interpretation and performance of the contract – issues clearly within the ambit of the Arbitration Clause which covers disputes over "the interpretation of any provision of, or the performance of obligations under," the Agreement.  Other courts have similarly compelled arbitration of modification and breach issues.  *See, e.g., Indian Harbor Ins. Co. v. Global Transport System, Inc.,* 191 F. Supp.2d 400, 403 (S.D. N.Y. 2002) (arbitration would be compelled of the dispute revolving around the viability of a modification to a policy containing an arbitration provision); *National Acc. Ins. Underwriters, Inc. v. Duncanson & Holt, Inc,* Civ. No. 94C-4287, 1994 WL 684720, 2-3 (N.D. Ill. Dec. 6, 1994) (dispute arising out of an agreement as modified by a letter describing "the revised agreement between two companies" would be ordered to arbitration).

The Shareholders allege Sanger Works has breached the covenant of good faith and fair dealing by failing or refusing to make Earn-Out payments or compensate them for acquisition of GSMA, depriving them of the benefit of their bargain.  Doc. No. 2 ¶¶ 37-39.  Such allegations of breach of good faith and fair dealing also go directly to the performance of the Agreement and are arbitrable.  *See, e.g., Primeco Personal Comm. v. Commonwealth,* 740 So.2d 585 (Fla. 3d DCA 1999) (compelling arbitration of claim for breach of implied covenant of good faith and fair dealing); *Double Sunrise Inc. v. Morrison Management Specialists Inc.*, 149 F.Supp.2d 1039 (N.D. Ill. 2001)

-12-

(acquiring corporation's alleged breach of good faith and fair dealing that negatively impacted the "earnout payment" owed to acquired corporation under Earn-Out agreement was covered by dispute resolution clause and subject to binding arbitration).

In the alternative, the Shareholders seek rescission of the Agreement (and other employment and non-compete agreements) and compensation for Sanger Works' unjust enrichment based on Sanger Works' alleged false representations, illusory obligations, and rendering payment of the Earn-Out amounts impossible.  Doc. No. 2 ¶¶45-46, 51-52.  Claims for rescission of the Agreement or unjust enrichment are based on the allegedly false representations concerning the Earn-Out payments and/or the Contract Gross Margins and go to interpretation or performance of the Agreement.  *See, e.g., RCM Technologies, Inc. v. Brignik Technology, Inc.*, 137 F. Supp.2d 550, 556 (D. N.J. 2001) (computer consulting firm's unjust enrichment claim was arbitrable where the factual allegation underlying the claim was the accuracy of asset seller's representations about net operating income, which dealt with "interpretation" of asset purchase agreement, an issue covered by the arbitration clause); *Sherson/Lehman Bros, Inc. v. Ordonez*, 497 So.2d 703, 704 (Fla. 4th DCA 1986) (rescission claims must be submitted to arbitration).

The Shareholders allege that Sanger Works made false representations concerning facts material to the transaction between the parties, which the Shareholders relied upon in entering into the Agreement.  Doc. No. 57-59.  The Supreme Court has held that claims for fraud in the inducement of the contract as a whole are also arbitrable.  *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967).  In *Prima Paint,* the Supreme Court held that "if the claim is fraud in the inducement of the arbitration clause itself – an issue which goes to the 'making' of the agreement to arbitrate – the federal court may proceed to adjudicate it. But the statutory language [of section 4] does not

permit the federal court to consider claims of fraud in the inducement of the contract generally."
*Prima Paint,* 388 U.S. at 403-404.  The Shareholders allege they were fraudulently induced to enter
the Agreement as a whole; thus, the claims are arbitrable pursuant to the precedent of *Prima Paint.*
*See also Sherson/Lehman Bros, Inc. v. Ordonez,* 497 So.2d 703, 704 (Fla. 4th DCA 1986) (claims that
the entire contract – as opposed to the arbitration clause – was induced by fraud must be submitted
to arbitration).

The Shareholders also allege that Sanger Works negligently made false statements concerning
material facts, knowing that the Shareholders would rely on the statements, inducing them to enter
into the Agreement.  Doc. No. 2 ¶ 65-68.  The Shareholders' claims for negligent misrepresentation
are also arbitrable.  *See, e.g., Hireshenson v. Spaccio*, 800 So.2d 670, 674 (Fla. 5DCA 2001)
(investor's claims for negligent misrepresentation were arbitrable); *Cuningham Hamiton Quiter, P.A.
v. B.L. of Miami, Inc.*, 776 So.2d 940, 943 (Fla. 3rd DCA 2000) (plaintiff was required to arbitrate
fraud and negligent misrepresentation claims); *Sherson/Lehman Bros, Inc. v. Ordonez*, 497 So.2d 703,
704 (Fla. 4th DCA 1986) (negligent misrepresentation claims must be submitted to arbitration in
accordance with federal precedents).

Because the Court finds that arbitration of the Shareholders' claims should be compelled, it
need not reach Sanger Works' alternative Motion to Dismiss.  While section 3 of the Federal
Arbitration Act mandates the court stay the litigation where the claims therein are properly referable
to arbitration, it does not provide for the dismissal of a case.  The Supreme Court has held that the
Federal Arbitration Act does not oust the district court's jurisdiction over claims subject to arbitration.
*The Anaconda v. American Sugar Refining Co.,* 322 U.S. 42, 44 (1944).  Instead, courts have
interpreted this to mean that section 3 contemplates continuing supervision by the district court to

ensure that arbitration proceedings are conducted within a reasonable period of time, thus preventing any impairment of plaintiff's rights to seek relief. *See, e.g., Meyer v. Dans un Jardin, S.A.,* 816 F.2d 533, 538-39 (10th Cir. 1987).

**Conclusion**

Based on the foregoing, it is respectfully **RECOMMENDED** that Sanger Works' Motion to Stay Litigation and Compel Arbitration (Doc. No. 4) be **GRANTED** to the extent it seeks a stay and an Order compelling the parties to arbitrate their disputes.  If this Report and Recommendation is adopted, the Clerk should be directed to close the file administratively, and the parties should be ordered to file periodic reports on the status of the arbitration.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Recommended in Orlando, Florida on March 30, 2007.

*David A. Baker*
_____
DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Courtroom Deputy